## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| CHRISTY JAROS, on behalf of herself and all others similarly situated, | |
| Plaintiff, | CASE NO. |
| v. | CLASS ACTION COMPLAINT |
| TIC INTERNATIONAL CORP., | <u>JURY TRIAL DEMANDED</u> |
| Defendant. | |

Christy Jaros ("Plaintiff"), individually and on behalf of all others similarly situated, through her undersigned counsel, alleges as follows against TIC International Corp. ("Defendant"), based upon personal knowledge as to herself and, as to all other matters, upon information and belief, including her counsel's investigation. Plaintiff believes additional evidentiary support exists for her allegations, given an opportunity for discovery.

## I.    INTRODUCTION

1.    This class action arises out of a recent cyberattack and data breach ("Data Breach") involving Defendant's administration of employee benefit funds.

2.    Through this Data Breach, an "[Defendant] experienced a system disruption due to an encryption attack," and following an investigation, "[Defendant] determined that personal information was acquired during the incident."[1]

3.    The information obtained included Plaintiff's name and Social Security number.

4.    Defendant is responsible for allowing the Data Breach to occur because it failed to implement and maintain reasonable safeguards and failed to comply with industry-standard data security practices as well as federal and state laws and regulations governing data security.

---

[1] *See* Exhibit A, Notice of Data Breach.

5.    During the duration of the Data Breach, Defendant failed to, among other things, detect that cyber-criminals had accessed its computer data and storage systems, notice the massive amounts of data that were compromised, and take any steps to investigate the red flags that should have warned Defendant that its systems were not secure. Had Defendant properly monitored its information technology infrastructure, it would have discovered the intrusion sooner.

6.    Defendant had obligations created by, among other things, federal and state regulations regarding data security, industry standards, and common law to keep their personal identifiable information ("PII"), confidential and to protect it from unauthorized access and disclosure.

7.    PII compromised in the Data Breach includes, at minimum, names and Social Security numbers of Plaintiff and the class members.

8.    Plaintiff and the class members provided their PII to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

9.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and data breaches in the financial and employee benefits industry preceding the date of the Data Breach.

10.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and class members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and the class members' PII from disclosure.

11.    Plaintiff and the class members have taken reasonable steps to maintain the confidentiality of their PII.

12.    Plaintiff and the class members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

13.    As a result of Defendant's failure to protect the PII to which it was entrusted, Plaintiff's and class members' PII was accessed by malicious cyber-criminals. Plaintiff and the class members therefore have been exposed to and are at a significant risk of identity theft, financial fraud, and other identity-related fraud into the indefinite future. They also suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach. Plaintiff and the class members have also lost the inherent value of their PII. This harm was compounded by Defendant's failure to ensure that consumers received proper and timely notification of the Data Breach.

14.    Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence; (ii) negligence per se; (iii) declaratory judgment; (iv) breach of confidence; (v) unjust enrichment; (vi) breach of implied contract; (vii) breach of the implied covenant of good faith and fair dealing; and (viii) a violation of the Arizona Consumer Fraud Act ("ACFA").

## II.    PARTIES

15.    Plaintiff is a natural person who at all relevant times resided in and is a citizen of Tempe, Arizona.

16.    Plaintiff has been receiving pension benefits administered by Defendant since 2012.

17.    Plaintiff entrusted PII and other confidential information, including financial information, demographic and contact information, to Defendant with the reasonable expectation and understanding that Defendant would protect, maintain, and safeguard that information from

compromise, unauthorized disclosure, and misuse by unauthorized users, and would be timely notified of any data security incidents involving her PII should such occur.

18.     Plaintiff received a Notice of Data Security Incident from Defendant dated October 24, 2022 (the "Notice").[2]

19.     The Notice informed Plaintiff that her Social Security Number and name were leaked as a result of the Data Breach.[3]

20.     Since learning about the Data Breach at the end of October 2022, Plaintiff has suffered emotional anguish and distress, including but not limited to anxiety related to the breach of her sensitive PII.

21.     As a result of the Data Breach, Plaintiff estimates that she has spent dozens of hours—potentially in excess of 100 hours—monitoring her credit score, checking on her accounts, and contacting her banks and creditors.

22.     Defendant is a Delaware corporation with a principal place of business located in Carmel, Indiana.

## III.    JURISDICTION AND VENUE

23.     This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims that necessarily raise substantial disputed federal issues under the FTC Act (15 U.S.C. § 45).

24.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and

---

[2]    *See* Exhibit A.

[3]    *Id.*

minimal diversity exists because putative class members, including Plaintiff, are citizens of a different state than Defendant.

25.     This Court has personal jurisdiction over Defendant because it is authorized to conduct and does regularly conduct business in Indiana and is headquartered in Indiana.

26.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     The nature of Defendant's business

27.     Defendant is a full-service provider of employee benefits administration and communication, with services including pension administration, HR consulting, payroll auditing, IT support, and administration of employee health care plans.

28.     Defendant knew it was a prime target for hackers given the significant amount of sensitive consumer PII processed through its computer data and storage systems, including Social Security numbers of beneficiaries of its services.

29.     Experts studying cyber security routinely identify employee benefits administrators as being particularly vulnerable to cyberattacks because of the value of the PII that they collect and maintain.

30.     For example, in 2020, a Department of Labor spokesperson emphasized that "[w]hen a plan fiduciary is hiring somebody who is going to be responsible for confidential, personal information, or who's going to be running systems to keep track of people's account balances and the like, there's a responsibility to make sure that you've hired that person prudently, that firm prudently . . . And if you think about plans and the universe I described, that's just shy of $11 trillion, and with personal health and pension data, there are a lot of tempting targets there

and what we've seen in our own enforcement actions, especially in our criminal programs, vulnerabilities are taken advantage of."[4]

31.    The Department of Labor additionally publishes its own "Cybersecurity Best Practices" guide for employee benefits administrators, which includes, among other things, the need to respond promptly to a detected data breach.[5]

32.    However, given the scope of the data breach and the nearly seven-month delay in reporting the breach to Plaintiff, Defendant did not (and does not) employ "best practices" in its cybersecurity, to the detriment of Plaintiff and the class members.

**B.    The Data Breach**

33.    Sometime following March 30, 2022, Defendant learned that it had experienced the Data Breach, which resulted in the loss of PII.

34.    According to Defendant, upon learning of the Data Breach, it reported the incident to the Federal Bureau of Investigation, secured its network, and then engaged the assistance of cybersecurity experts to assist in the company's investigation.

35.    The Security Incident notification disclosed that the PII accessed in the Data Breach included Plaintiff's name and Social Security number.

36.    However, the Security Incident notification did not disclose or explain the reason for the approximately *seven-month delay* between the Data Breach and Plaintiff's receipt of notice of the breach.

---

[4]    *DOL to Issue Guidance, Ramp up Investigations on Cybersecurity*, National Association of Plan Advisors, https://www.napa-net.org/news-info/daily-news/dol-issue-guidance-ramp-investigations-cybersecurity (last visited November 28, 2022).

[5]    *Cybersecurity Program Best Practices*, Department of Labor, https://www.dol.gov/sites/dolgov/files/ebsa/key-topics/retirement-benefits/cybersecurity/best-practices.pdf (last visited November 28, 2022).

37.    Defendant learned that the PII accessed in the Data Breach was accessed by "a 'Russian criminal organization referred to as Conti.' Conti is one of the most prolific hacker groups, which first started carrying out ransomware attacks in 2020. As of August 2022, the group is believed to have targeted over 1,000 organizations, earning more than $180 million dollars in ransoms. The U.S. government sees the Conti ransomware gang as such a threat that it has offered a $10 million reward for information regarding certain members of the group."[6]

38.    Because of the nature of the PII stored or processed by Defendant, Plaintiff believes that all categories of PII held by Defendant were subject to unauthorized access and exfiltration, theft, or disclosure.

39.    Defendant's delayed response to the Data Breach caused confusion among the victims of the Data Breach, resulting in Plaintiff and the class members spending time, and continuing to spend a significant amount of time into the future, taking measures to protect themselves from identity theft, fraud, and other identity-related crimes.

40.    Defendant is responsible for allowing the Data Breach to occur because it failed to implement and maintain any reasonable safeguards and failed to comply with industry-standard data security practices, contrary to state and federal laws and regulations and its own duties to protect its customers' PII.

41.    As a result of Defendant's failure to protect the sensitive PII with which it was entrusted, Plaintiff and the class members are at a significant risk of identity theft, financial fraud, and other identity-related fraud into the indefinite future. Plaintiff and the class members have also lost the inherent value of their PII.

---

[6]    *TIC International Corporation Reports Data Breach Following Conti Ransomware Attack*, JDSupra, https://www.jdsupra.com/legalnews/tic-international-corporation-reports-9831157/ (last visited November 28, 2022).

C. **Defendant Failed to Comply with Statutory and Regulatory Obligations**

42.     Defendant has a number of obligations, including those created under the FTC Act, industry standards, and common law, to keep Plaintiff's and class members' PII confidential and to protect it from unauthorized access and disclosure.

43.     Defendant is prohibited by the FTC Act (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

44.     Moreover, federal agencies have issued recommendations and guidelines to temper data breaches and the resulting harm to individuals and financial institutions. For example, the FTC has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[7]

45.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[8] Among other things, the guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also

---

[7]    Federal    Trade    Commission,    *Start    With    Security*    (June    2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf    (last visited November 28, 2022).

[8]    Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf ((last visited November 28, 2022).

recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[9]

46.     Additionally, the FTC recommends that companies limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[10]

47.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[11]

48.     Defendant is also required by Arizona's Data Breach Notification Law, A.R.S. §§ 18-551-18-552, and various other states' laws and regulations to protect Plaintiff's and class members' PII, and further, to handle any breach of the same in accordance with applicable breach notification statutes.

---

[9]   *Id.*

[10]   FTC, *Start With Security*, *supra* note 7.

[11]   Federal Trade Commission, *Privacy and Security Enforcement: Press Releases*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited November 28, 2022).

49.    For example, Arizona law requires that Defendant notify injured consumers "within forty-five days after the determination" "that there has been a security system breach." *Id.* at §18-552(B).

50.    Defendant states that it "completed" its investigation on August 22, 2022 after discovering the Data Breach on or about March 30, 2022; therefore, even using the most generous interpretation of its reporting deadlines, Defendant failed to notify Plaintiff of the Data Breach within 45 days of the determination of the breach.

51.    Defendant's unreasonable delay in notifying Plaintiff increased her risk of identity theft and fraudulent use of her PII because it prevented Plaintiff from taking post-disclosure remedial action for an extended period of time—months longer than the period contemplated by Arizona law.

52.    In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiff and the class members, whose PII was entrusted to Defendant, to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and the class members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its systems and networks adequately protected the PII of Plaintiff and the class members.

53.    Defendant owed a duty to Plaintiff and the class members whose PII was entrusted to Defendant to design, maintain, and test its systems to ensure that the PII in Defendant's possession was adequately secured and protected.

54.    Defendant owed a duty to Plaintiff and the class members whose PII was entrusted to Defendant to create and implement reasonable data security practices and procedures to protect the PII in their possession.

55.     Defendant owed a duty to Plaintiff and the class members whose PII was entrusted to Defendant to implement processes that would detect a breach on its data security systems in a timely manner.

56.     Defendant owed a duty to Plaintiff and the class members whose PII was entrusted to Defendant to act upon data security warnings and alerts in a timely fashion.

57.     Defendant owed a duty to Plaintiff and the class members whose PII was entrusted to Defendant to disclose if its systems and data security practices were inadequate to safeguard individuals' PII from theft because such an inadequacy would be a material fact in the decision to entrust PII with Defendant.

58.     Defendant owed a duty to Plaintiff and the class members whose PII was entrusted to Defendant to disclose in a timely and accurate manner when data breaches occurred.

59.     Defendant owed a duty of care to Plaintiff and the class members because they were foreseeable and probable victims of any inadequate data security practices.

60.     Plaintiff and the class members provided their PII to Defendant with the expectation and understanding that Defendant would adequately protect and store their data.

61.     In this case, Defendant was fully aware of its obligation to use reasonable measures to protect the PII of its customers. Defendant also knew it was a target for hackers. But despite understanding the consequences of inadequate data security, Defendant failed to comply with industry-standard data security requirements.

62.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45, and various state consumer protection and data breach statutes.

### D.    Effect of the Data Breach

63.    Defendant's failure to keep Plaintiff's and class members' PII secure has severe ramifications. Given the sensitive nature of the PII compromised in the Data Breach, cyber-criminals can commit identity theft and other identity-related fraud against Plaintiff and the class members now and into the indefinite future.

64.    The value of Plaintiff's and the class members' PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" Internet websites, making the information publicly available, for a substantial fee.

65.    It can take consumers years to spot identity or PII theft, giving criminals plenty of time to exploit that information for as much cash as possible.

66.    Defendant has disclosed and given access to the PII of Plaintiff and the class members for criminals to use in the conduct of criminal activity. Specifically, Defendant has opened up, disclosed, and exposed the contact information and PII of Plaintiff and the class members to persons engaged in disruptive and unlawful business practices and tactics, including spam and "phishing" emails, robo-dialed calls, junk texts and faxes, other unwanted calls and communications, online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (*i.e.*, identity fraud), all using stolen PII.

67.    Defendant's use of outdated and insecure computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for patient and consumer privacy, and has exposed the PII of Plaintiff and the class members to cyber-criminals.

68.    PII also has significant monetary value in part because criminals continue their efforts to obtain this data.[12] In other words, if any additional breach of sensitive data did not have incremental value to criminals, one would expect to see a reduction in criminal efforts to obtain such additional data over time. Instead, just the opposite has occurred. For example, the Identity Theft Resource Center reported 1,473 data breaches in 2019, which represents a 17 percent increase from the total number of breaches reported in 2018.[13]

69.    The value of PII is key to unlocking many parts of the financial sector for consumers. Whether someone can obtain a mortgage, credit card, business loan, tax return, or even apply for a job depends on the integrity of their PII. Similarly, the businesses that request (or require) consumers to share their PII as part of a commercial transaction do so with the expectation that its integrity has not been compromised.

70.    Annual monetary losses for victims of identity theft are in the billions of dollars. In 2017, fraudsters stole $16.8 billion from consumers in the United States, which includes $5.1 billion stolen through bank account take-overs.[14]

71.    The annual cost of identity theft is even higher. McAfee and the Center for Strategic and International Studies estimates that the likely annual cost to the global economy from cybercrime is $445 billion a year.[15]

---

[12]    *Data Breaches Rise as Cybercriminals Continue to Outwit IT*, CSO Online (Sept. 29, 2014), available at https://www.csoonline.com/article/2688872/data-breaches-rise-as-cybercriminals-continue-to-outwit-it.html (last visited November 28, 2022).

[13]    *2019 End-of-Year Data Breach Report* (2019), Identity Theft Resource Center, *available at* https://www.idtheftcenter.org/wp-content/uploads/2020/01/01.28.2020_ITRC_2019-End-of-Year-Data-Breach-Report_FINAL_Highres-Appendix.pdf (last visited November 28, 2022).

[14]    Javelin, *2018 Identity fraud: Fraud Enters A New Era of Complexity*, available at https://www.javelinstrategy.com/coverage-area/2018-identity-fraud-fraud-enters-new-era-complexity (last visited November 28, 2022).

[15]    Insurance Information Institute, *Facts + Statistics: Identity theft and cybercrime*, available at https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited November 28, 2022).

72.    Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, in addition to the irreparable damage that may result from the theft of PII, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. After conducting a study, the Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[16]

73.    The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[17]

74.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert, reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[18]

75.    Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

76.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name

---

[16]    U.S. Department of Justice, *Victims of Identity Theft, 2014* (Revised November 13, 2017), available at http://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited November 28, 2022).

[17]    *See* U.S. Government Accountability Office, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, at 2, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited August 5, 2022) ("GAO Report").

[18]    *See* https://www.identitytheft.gov/Steps (last visited August 5, 2022).

and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

77.    In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

78.    A 2021 study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[19]

| Upon or after discovering the incident, did you experience any of the other following problems? | | |
|---|---|---|
| | I was generally inconvenienced. | 87.5% |
| | I lost time at work. | 37.5% |
| | I missed time from school. | 11.1% |
| | I lost my home/place of residence. | 11.1% |
| | My utilities were cut off or I was denied new service. | 12.5% |
| | I lost out on an employment opportunity. | 16.7% |
| | I lost a job. | 8.3% |
| | A lawsuit was filed against me. | 8.3% |
| | Other. | 25.0% |
| | | |

79.    Even before the occurrence of identity theft, victims may spend valuable time investigating the relevant data breach and suffer from the emotional toll of that data breach.

---

[19]    *See* Identity Theft Resource Center, *2021 ITRC Consumer Aftermath Responses: Non-Pandemic Related*, https://www.idtheftcenter.org/wp-content/uploads/2021/05/2021-ITRC-Consumer-Aftermath-Responses-Non-Pandemic-Related.pdf (last visited August 5, 2022).

80.    Plaintiff estimates that she has spent dozens of hours—potentially in excess of 100 hours—monitoring her credit score, checking on her accounts, and contacting her banks and creditors.

81.    However, due to Defendant's unreasonable delay in notifying Plaintiff of the Data Breach, Plaintiff was unable to take mitigating action or investigate until approximately seven months after the Data Breach occurred, further increasing her risk of harm and future fraudulent use of her PII.

82.    Plaintiff will continue to expend time reviewing account statements and financial transactions to monitor against potential future fraud.

83.    What's more, theft of Private Information is also gravely serious. PII is a valuable property right.[20]

84.    The value of PII is axiomatic, considering the value of "Big Data" in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

85.    It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and also between when Private Information or financial information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.

---

[20]    *See, e.g.*, John T. Soma, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[21]

86.     Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

87.     Indeed, a robust "cyber black market" exists in which criminals openly post stolen Private Information on multiple underground internet websites.

88.     There may also be a significant time lag between when PII is stolen and when it is actually misused. According to GAO, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[22]

89.     Thus, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and the class members are at an increased risk of fraud and identity theft for many years into the future.

90.     Thus, Plaintiff and the class members must vigilantly monitor their financial accounts for many years to come.

91.     To date, Defendant has not provided Plaintiff the class members with full relief for the damages they have suffered as a result of the Data Breach.

92.     Plaintiff and the class members have been damaged by the compromise of their PII in the Data Breach.

---

[21]  *See* GAO Report at 29.

[22]  U.S. Government Accountability Office, *Report to Congressional Requesters* (June 2007), http://www.gao.gov/new.items/d07737.pdf (last visited November 28, 2022).

93.     Plaintiff's PII was stolen and is now in the hands of data thieves as a direct and proximate result of the Data Breach.

94.     As a direct and proximate result of Defendant's conduct, Plaintiff and the class members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

95.     As a direct and proximate result of Defendant's conduct, Plaintiff and the class members have been forced to expend time dealing with the effects of the Data Breach.

96.     As the result of the Data Breach, Plaintiff and the class members have suffered or will suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

(a)     identity theft and fraud resulting from theft of their PII;

(b)     costs associated with the detection and prevention of identity theft and unauthorized use of their online accounts, including financial accounts;

(c)     losing the inherent value of their PII;

(d)     costs associated with purchasing credit monitoring and identity theft protection services;

(e)     unauthorized access to and misuse of their online accounts;

(f)     unauthorized access to and misuse of their PII;

(g)     unauthorized charges and loss of use of and access to their financial account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

(h)     lowered credit scores resulting from credit inquiries following fraudulent activities;

(i)     costs associated with time spent and the loss of productivity or enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including discovering fraudulent charges, cancelling and reissuing cards, addressing other varied instances of identity theft – such as credit cards, bank accounts, loans, government benefits, and other services procured using the stolen PII, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts, updating login information for online accounts sharing the same login credentials as were compromised in the Data Breach, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach;

(j)     the continued imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being in the possession of one or more unauthorized third parties; and

(k)     continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and the class members.

97.     Additionally, Plaintiff and the class members place significant value in data security. According to a recent survey conducted by cyber-security company FireEye, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more

in order to work with a provider that has better data security. Likewise, 70% of consumers would provide less personal information to organizations that suffered a data breach.[23]

98.     Indeed, Plaintiff has taken steps to protect herself from identity theft and fraud both proactively and in response to the Data Breach. For example, Plaintiff (1) does not share PII through websites she knows to be unsecure; (2) periodically monitors her credit report (with the frequency of such reviews having increased significantly following her receipt of notice of the Data Breach); (3) keeps copies of receipts and requires the delivery of paper financial statements in order to confirm the accuracy of receipts; (4) periodically checks her credit card accounts (with the frequency of such reviews having increased significantly following her receipt of notice of the Data Breach); (5) periodically checks her credit score with the credit reporting bureaus (with the frequency of such reviews having increased significantly following her receipt of notice of the Data Breach); (6) following receipt of notice of the Data Breach, requesting a copy of her credit report; and (7) following receipt of notice of the Data Breach, placing alerts on all of her credit score accounts.

99.     Because of the value consumers place on data privacy and security, companies with robust data security practices can command higher prices than those who do not. Indeed, if consumers did not value their data security and privacy, companies like Defendant would have no reason to tout their data security efforts to their actual and potential customers.

100.    Had the victims of the Data Breach, including Plaintiff, known the truth about Defendant's data security practices – that Defendant would not adequately protect and store their data – they would have sought administration of employment benefits from one of Defendant's competitors, or paid a different premium to transact with Defendant.

---

[23] FireEye, *Beyond the Bottom Line: The Real Cost of Data Breaches* (May 11, 2016), https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html    (last visited November 25, 2020).

101.    Additionally, Plaintiff and the class members have an interest in ensuring that their PII, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information is not accessible online and that access to such data is password-protected.

102.    Further, as a result of Defendant's conduct, Plaintiff and the class members are forced to live with the anxiety that their PII may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

103.    As a direct and proximate result of Defendant's actions and inactions, Plaintiff and the class members have suffered anxiety, emotional distress, and loss of privacy, and are at an at an increased and imminent risk of fraud, criminal misuse of their PII, and are at a continuing risk of identity theft for years to come as result of the Data Breach and Defendant's deceptive and unconscionable conduct.

**E.    Plaintiff's and class members' damages.**

104.    To date, Defendant has not provided Plaintiff and the members of the Class with equitable relief for the damages they have suffered as a result of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach.

105.    Specifically, Defendant has only offered 12 months of inadequate identity monitoring services, and it is unclear whether that credit monitoring was only offered to certain affected individuals (based upon the type of data stolen) or to all persons whose data was compromised in the Data Breach.

106.    Moreover, the 12 months of credit monitoring offered to persons whose private information was compromised is wholly inadequate as it fails to provide for the fact that victims

of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud.

107.    Defendant did not provide any compensation for the unauthorized release and disclosure of Plaintiff's and class members' PII.

108.    Plaintiff and the class members have been damaged by the compromise of their PII in the Data Breach.

109.    Moreover, Defendant's delay in noticing affected persons of the theft of their PII prevented early mitigation efforts and compounded the harm.

## V.    CLASS ACTION ALLEGATIONS

110.    Pursuant to Federal Rule of Civil Procedure 23(b)(1), (b)(2), (b)(3), and (c)(4), Plaintiff seeks certification of the following class and subclasses:

> **National Class**: All residents of the United States of America whose PII was compromised in the Data Breach.

> **Arizona Subclass**: All residents of Arizona whose PII was compromised in the Data Breach.

111.    The National Class and Subclasses are collectively referred to herein as the "Class."

112.    Excluded from the Class are employees Defendant, Defendant itself, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, members of their judicial staff, and any judge sitting in the presiding court system who may hear an appeal of any judgment entered.

113.    **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is

impractical. Defendant has admitted over one hundred thousand consumers across the country were affected by the Data Breach.[24]

114.  **Commonality and Predominance. Fed. R. Civ. P. 23(a)(2) and (b)(3).** This action involves common questions of law and fact that predominate over any questions affecting individual Class members. The common questions include, but are not limited to:

(a)  Whether Defendant knew or should have known that its computer and data storage systems were vulnerable to attack;

(b)  Whether Defendant omitted or misrepresented material facts regarding the security of its computer and data storage systems and their inability to protect vast amounts of sensitive data, including Plaintiff's and Class members' PII;

(c)  Whether Defendant failed to take adequate and reasonable measures to ensure such computer and data systems were protected;

(d)  Whether Defendant failed to take available steps to prevent and stop the Data Breach from happening;

(e)  Whether Defendant failed to disclose the material facts that it did not have adequate computer systems and security practices to safeguard PII;

(f)  Whether Defendant owed duties to Plaintiff and the class members to protect their PII;

(g)  Whether Defendant owed a duty to provide timely and accurate notice of the Data Breach to Plaintiff and the class members;

---

[24] *See Data Breach Notifications*, Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/a08c2070-eb21-4246-9b25-7dadbb21919a.shtml (last visited November 28, 2022).

(h)    Whether Defendant breached its duties to protect the PII of Plaintiff and the class members by failing to provide adequate data security;

(i)    Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and the class members;

(j)    Whether Defendant's failure to secure Plaintiff's and class members' PII in the manner alleged violated federal, state and local laws and regulations, or industry standards;

(k)    Whether Defendant was negligent, reckless or intentionally indifferent in its representations to Plaintiff and the class members concerning its security protocols;

(l)    Whether Defendant was negligent in making misrepresentations to Plaintiff and the class members;

(m)    Whether Defendant was negligent in establishing, implementing, and following security protocols;

(n)    Whether the Plaintiff's and class members' PII was compromised and exposed as a result of the Data Breach and the extent of that compromise and exposure;

(o)    Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the Data Breach, resulting in the unauthorized access to and/or theft of Plaintiff's and class members' PII;

(p)    For the Arizona Subclass, whether Defendant's conduct amounted to violations of Arizona's consumer protection statutes;

(q)    Whether, as a result of Defendant's conduct, Plaintiff and the class members face a significant threat of harm and/or have already suffered harm, and, if so, the appropriate measure of damages to which they are entitled;

(r)    Whether, as a result of Defendant's conduct, Plaintiff and the class members are entitled to injunctive, equitable, declaratory and/or other relief, and, if so, the nature of such relief;

(s)    Whether Plaintiff and the class members are entitled to compensatory damages;

(t)    Whether the Plaintiff and the class members are entitled to punitive damages; and

(u)    Whether the Plaintiff and the class members are entitled to statutory damages.

115.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of other Class members' claims because Plaintiff and the class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

116.    **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class. Plaintiff is a member of the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation and consumer protection claims. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

117.    **Risk of Inconsistent or Varying Adjudications. Fed. R. Civ. P. 23(b)(1).** As the proposed Class members include hundreds of thousands of consumers, there is significant risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant. For example, injunctive relief may be entered in multiple cases, but the ordered relief may vary, causing Defendant to have to choose between differing means of upgrading its data security infrastructure and choosing the court order with which it will comply. Class action status is also warranted because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other

members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

118.    **Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2).** Class certification is also appropriate under Rule 23(b)(2). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole. Moreover, Defendant continues to maintain its inadequate security practices, retains possession of Plaintiff's and the Class members' PII, and has not been forced to change its practices or to relinquish PII by nature of other civil suits or government enforcement actions, thus making injunctive and declaratory relief a live issue and appropriate to the Class as a whole.

119.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to Plaintiff and the Class members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class members are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Moreover, individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

120.    Particular issues are appropriate for certification under **Fed. R. Civ. P. 23(c)(4)** because the claims present particular, common issues, the resolution of which would materially advance the resolution of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

(a)    Whether Class members' PII was accessed, compromised, or stolen in the Data Breach;

(b)    Whether (and when) Defendant knew about the Data Breach before it notified Plaintiff and the class members and whether Defendant failed to timely notify Plaintiff and the class members of the Data Breach;

(c)    Whether Defendant owed a legal duty to Plaintiff and the Class;

(d)    Whether Defendant failed to take reasonable steps to safeguard the PII of Plaintiff and the Class members;

(e)    Whether Defendant failed to adequately monitor its data security systems;

(f)    Whether Defendant concealed material information about their inadequate data security measures from Plaintiff and the Class;

(g)    Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

(h)    Whether Defendant's acts, omissions, and misrepresentations, and practices were likely to deceive consumers;

(i)    Whether Defendant knew or should have known that they did not employ reasonable measures to keep Plaintiff's and class members' PII secure;

(j)    Whether adherence to FTC data security obligations, industry standard, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## COUNT I
## <u>NEGLIGENCE</u>

**Against Defendant on Behalf of Plaintiff and the National Class or, Alternatively,
on Behalf of Plaintiff and the Arizona Subclass**

121.    Plaintiff repeats the allegations in paragraphs 1-120 in this Complaint, as if fully alleged herein.

122.    Defendant required Plaintiff and the Class members to submit non-public PII to obtain employment and post-employment benefits administration.

123.    Defendant, in offering employee benefits administration to its customers, knew that Plaintiff and the Class members' sensitive PII would be stored or processed by Defendant computer and data storage systems. Defendant, in fact, stored or processed this PII through and on its computer systems and/or databases.

124.    By collecting, storing, and using this data, Defendant had a duty of care to Plaintiff and the Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting this PII in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. More specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems and data storage architecture to ensure that Plaintiff's and Class members' PII was adequately secured and protected; (b) implementing processes that would detect an unauthorized breach of Defendant's security systems and data storage architecture in a timely manner; (c) timely acting on all warnings and alerts, including public information, regarding Defendant's security vulnerabilities and potential compromise of the PII of Plaintiff and the class members; (d) maintaining data security measures consistent with industry standards and applicable state and federal law and other requirements discussed herein; and (e) timely and adequately informing Plaintiff and the Class members if and when a data breach occurred notwithstanding undertaking (a) through (d) above.

125.    Defendant had common law duties to prevent foreseeable harm to Plaintiff and the class members. These duties existed because Plaintiff and the Class members were the foreseeable and probable victims of any inadequate security practices in Defendant's affirmative collection of consumers' PII. In fact, not only was it foreseeable that Plaintiff and the Class members would be harmed by the failure to protect their PII because hackers routinely attempt to steal such information and use it for nefarious purposes, Defendant knew that it was more likely than not Plaintiff and other Class members would be harmed by such theft.

126.    Defendant had a duty to monitor, supervise, control, or otherwise provide oversight to safeguard the PII that was collected, stored, and processed by Defendant computer and data storage systems.

127.    Defendant's duties to use reasonable security measures also arose as a result of the special relationship that existed between Defendant, on the one hand, and Plaintiff and the Class members, on the other hand. The special relationship, which is recognized by laws and regulations including but not limited to common law, arose because Plaintiff and the Class members entrusted Defendant with their PII by virtue of Defendant's administration of their employee benefits. Defendant alone could have ensured that its security systems and data storage architecture were sufficient to prevent or minimize the Data Breach.

128.    Defendant's duties to use reasonable data security measures also arose under Section 5 of the FTC Act," 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII. Various FTC publications and data security breach orders further form the basis of Defendant's duties. In addition, individual states have enacted statutes based upon the FTC Act, including California's Unfair Competition Law, the Connecticut Unfair

Trade Practices Act, the Florida Deceptive and Unfair Trade Practices Act, and the Missouri Merchandising Practices Act, that also created a duty.

129.    The harm that has occurred is the type of harm the FTC Act and similar state statutes were intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of the businesses' failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and the class members.

130.    Defendant knew or should have known that its computer systems and data storage architecture were vulnerable to unauthorized access and targeting by hackers for the purpose of stealing and misusing confidential PII.

131.    Defendant knew or should have known that a breach of its systems and data storage architecture would inflict millions of dollars of damages upon Plaintiff and the Class members, and Defendant was therefore charged with a duty to adequately protect this critically sensitive information.

132.    Defendant breached the duties it owed to Plaintiff and the Class members described above and thus, was negligent. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

(a)    Failing to adopt, implement, and maintain adequate security measures (including adequate security systems, protocols, and practices) to safeguard Plaintiff's and Class members' PII;

(b)    Failing to adequately monitor the security of its networks and systems;

(c)    Failing to periodically ensure that its IT systems had plans in place to maintain reasonable data security safeguards;

(d)    Allowing unauthorized access to Plaintiff's and Class members' PII;

(e)    Failing to detect in a timely manner that Plaintiff's and Class members' PII had been compromised; and

(f)    Failing to timely notify Plaintiff and the Class members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

133.    Defendant also failed to exercise reasonable care and breached the duties it owed Plaintiff and the Class members when it provided the thieves or subsequent unauthorized recipients of the stolen information with additional time and cover to further pilfer and re-sell the stolen PII belonging to Plaintiff and the Class members; provided the thieves and the purchasers or other subsequent unauthorized recipients with an opportunity to directly defraud Plaintiff and the Class members; and failed to promptly notify Plaintiff and the class members of the fact that their PII was compromised and in imminent jeopardy of falling further into the hands of cyber criminals.

134.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and the Class members, their PII would not have been compromised, or the risks associated with the compromise of their PII would be significantly mitigated.

135.    It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiff's and Class members' PII would result in injury to Plaintiff and the Class members.

136.    Further, the Data Breach was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the employee benefits administration industry.

137.    It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class members' PII would result in one or more types of injuries to Plaintiff and the class members.

138.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class members have been injured and are entitled to compensatory and consequential damages in an amount to be proven at trial. Such injuries include those described above, including one or more

of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach investigating the nature of the Data Breach not fully disclosed by Defendant, reviewing bank statements, payment card statements, provider and insurance statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; and other economic and non-economic harm.

139.    Plaintiff and the Class members are also entitled to injunctive relief requiring Defendant to, among other things, (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) provide adequate credit monitoring and identity theft protection services to Plaintiff and all class members.

## COUNT II
## NEGLIGENCE PER SE

**Against Defendant on Behalf of Plaintiff and the National Class or, Alternatively, on Behalf of Plaintiff and the Arizona Subclass**

140.    Plaintiff repeats the allegations in paragraphs 1-120 in this Complaint, as if fully alleged herein, and asserts this claim in the alternative to their negligence claim to the extent necessary.

141.    Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security to safeguard the PII of Plaintiff and the Class members.

142.    The FTC Act prohibits "unfair . . . practices in or affecting commerce," which the FTC has interpreted to include businesses' failure to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard. In addition, individual states have enacted statutes based upon the FTC Act, including the ACFA, that also created a duty.

143.    Pursuant to the ACFA, Defendant had duty to provide fair and adequate computer systems and data security to safeguard the PII of Plaintiff and the Class members. *See generally* A.R.S. §44-1521, *et seq.*

144.    Defendant solicited, gathered, and stored PII of Plaintiff and the Class members to facilitate transactions which affect commerce.

145.    Defendant violated the FTC Act (and similar state statutes) and the ACFA by failing to use reasonable measures to protect PII of Plaintiff and the class members and not complying with applicable industry standards, as described herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

146.    Defendant's violation of the FTC Act (and similar state statutes) as well as its violations of the ACFA constitutes negligence *per se*.

147.    Plaintiff and the Class members are within the class of persons that the FTC Act (and similar state statutes), and the ACFA were intended to protect.

148.    The harm that occurred as a result of the breach is the type of harm the FTC Act (and similar state statutes), and the ACFA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures caused the same harm as that suffered by Plaintiff and the Class members.

149.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class members have suffered, and continue to suffer, damages arising from the breach as described herein and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

150.    Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach investigating the nature of the Data Breach not fully disclosed by Defendant, reviewing bank statements, payment card statements, provider and insurance statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; and other economic and non-economic harm.

## COUNT III
## DECLARATORY JUDGMENT

**Against Defendant on Behalf of Plaintiff and the National Class or, Alternatively, on Behalf of Plaintiff and the Arizona Subclass**

151.    Plaintiff repeats the allegations in paragraphs 1-120 in this Complaint, as if fully alleged herein.

152.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

153.    An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard its users' PII, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and the Class members from further data breaches that compromise their PII. Plaintiff and the Class members remain at imminent risk that further compromises of their PII will occur in the future. This is true even if they are not actively using Defendant's products or services.

154.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

(a)    Defendant continues to owe a legal duty to secure users' PII and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, and various state statutes; and

(b)    Defendant continues to breach this legal duty by failing to employ reasonable measures to secure Plaintiff and the class members' PII.

155.    The Court also should issue corresponding prospective injunctive relief pursuant to 28 U.S.C. §2202, requiring Defendant to employ adequate security practices consistent with law and industry standards to protect its users' PII.

156.    If an injunction is not issued, Plaintiff and the Class members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of Defendant. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiff and the Class members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

157.    The hardship to Plaintiff and the Class members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another data

breach occurs at Defendant, Plaintiff and the Class members will likely be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

158.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating additional injuries that would result to Plaintiff, class members, and the millions of other Defendant customers whose PII would be further compromised.

## COUNT IV
## BREACH OF CONFIDENCE

**Against Defendant on Behalf of Plaintiff and the National Class or, Alternatively, on Behalf of Plaintiff and the Arizona Subclass**

159.    Plaintiff repeats the allegations in paragraphs 1-120 in this Complaint, as if fully alleged herein.

160.    At all times during Plaintiff's and Class members' interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiff's and class members' PII.

161.    Defendant's relationship with Plaintiff and the Class members was governed by terms and expectations that Plaintiff's and Class members' PII would be collected, stored, and protected in confidence, and would not be disclosed to the public or any unauthorized third parties.

162.    Plaintiff and the Class members provided their respective PII, which was both confidential and novel, to Defendant with the explicit and implicit understandings that Defendant would protect and not permit their PII to be disseminated to the public or any unauthorized parties.

163.    Plaintiff and the Class members also provided their respective PII to Defendant with the explicit and implicit understandings that Defendant would take precautions to protect the

PII from unauthorized disclosure, such as following basic principles of encryption and information security practices.

164.     Defendant voluntarily received, in confidence, Plaintiff's and Class members' PII with the understanding that PII was confidential and novel and, as such, would not be disclosed or disseminated to the public or any unauthorized third parties.

165.     Due to Defendant's failure to prevent, detect, and avoid the Data Breach from occurring by following best information security practices to secure Plaintiff's and Class members' PII, Defendant caused Plaintiff's and Class members' PII to be disclosed and misappropriated to the public and unauthorized third parties beyond Plaintiff's and Class members' confidence, and without their express permission.

166.     But for Defendant's disclosure of Plaintiff's and Class members' PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, or used by unauthorized third parties. The Data Breach was the direct and legal cause of the theft of Plaintiff's and Class members' PII, as well as the resulting damages.

167.     The injury and harm Plaintiff and the Class members suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiff's and Class members' PII. Defendant knew its computer systems and technologies for accepting, securing, and storing Plaintiff's and Class members' PII had serious security vulnerabilities because Defendant failed to observe even basic information security practices or correct known security vulnerabilities.

168.     As a direct and proximate result of Defendant's breaches of confidence, Plaintiff and the Class members have been injured and were damaged as discussed herein and as will be proven at trial.

169.     Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and

economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach investigating the nature of the Data Breach not fully disclosed by Defendant, reviewing bank statements, payment card statements, provider and insurance statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; and other economic and non-economic harm.

## COUNT V
## UNJUST ENRICHMENT

**Against Defendant on Behalf of Plaintiff and the National Class or, Alternatively, on Behalf of Plaintiff and the Arizona Subclass**

170.    Plaintiff repeats the allegations in paragraphs 1-120 in this Complaint, as if fully alleged herein.

171.    Plaintiff and the Class members conferred a monetary benefit on Defendant in the form of monies or fees paid for services from Defendant in the form of administration fees and similar contractual payments for the administration of employee benefits. Defendant had knowledge of this benefit when it accepted the money from Plaintiff and the Class members.

172.    The monies or fees paid by Plaintiff and the Class members were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiff and the Class members.

173.    Defendant failed to provide reasonable security, safeguards, and protections to the PII of Plaintiff and the Class members, and as a result Plaintiff and the Class members overpaid Defendant as part of services they purchased.

174.    Defendant failed to disclose to Plaintiff and the Class members that its computer systems and security practices were inadequate to safeguard users' and former users' PII against theft.

175.    Under principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and the Class members because Defendant failed to provide adequate safeguards and security measures to protect Plaintiff's and Class members' PII that they paid for but did not receive.

176.    Defendant wrongfully accepted and retained these benefits to the detriment of Plaintiff and the Class members.

177.    Defendant's enrichment at the expense of Plaintiff and the Class members is and was unjust. As a result of Defendant's wrongful conduct, as alleged above, Plaintiff and the Class members are entitled under the common laws of all 50 states to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

### COUNT VI
### BREACH OF IMPLIED CONTRACT

**Against Defendant on Behalf of Plaintiff and the National Class or, Alternatively, on Behalf of Plaintiff and the Arizona Subclass**

178.    Plaintiff repeats the allegations in paragraphs 1-120 in this Complaint, as if fully alleged herein.

179.    Plaintiff and the Class members entered into implied contracts with Defendant to implement adequate data security practices to protect and safeguard the integrity of Plaintiff and Class members' PII.

180.    The entrustment of Plaintiff and Class members' PII to Defendant occurred in the course of Defendant's regular business practices, at Defendant's instruction and invitation.

181.    As a condition for receiving benefits administered by Defendant, Plaintiff and the Class were required to provide their PII to Defendant.

182.    As a further condition for receiving benefits administered by Defendant, Plaintiff and the Class entered into implied contracts with Defendant where Defendant agreed to safeguard and protect their PII, to prevent the disclosure of their PII, and to timely notify Plaintiff and the Class in the event that their PII is improperly accessed or stolen.

183.    Plaintiff and the Class satisfied their obligations under their implied contracts with Defendant.

184.    Defendant breached its implied contracts with Plaintiff and the Class by failing to safeguard and protect their PII, failing to prevent the disclosure of their PII, and failing to timely notify Plaintiff and the Class about the Data Breach.

185.    As a result of Defendant's breach of implied contract, Plaintiff and the Class were injured in their business or property in that they never would have allowed their sensitive and personal data to be provided to Defendant if they had been told or knew that Defendant failed to maintain sufficient security to keep such data from being hacked and taken by others.

186.    Plaintiff and the Class seek actual damages, compensatory damages, injunctive relief, and reasonable costs and attorneys' fees as a result of Defendants' breach of implied contract.

### COUNT VII
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

**Against Defendant on Behalf of Plaintiff and the National Class or, Alternatively, on Behalf of Plaintiff and the Arizona Subclass**

187.    Plaintiff repeats the allegations in paragraphs 1-120 in this Complaint, as if fully alleged herein.

188.    Every contract has an implied covenant of good faith and fair dealing, which is an independent duty to act in good faith and deal fairly in transactions, and which may be breached even when there is no breach of a contract's express terms.

189.    Plaintiff and the Class satisfied their obligations under their contracts with Defendant.

190.    Defendant breached its implied contracts with Plaintiff and the Class by failing to safeguard and protect their PII, failing to prevent the disclosure of their PII, and failing to timely notify Plaintiff and the Class about the Data Breach.

191.    As a result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class were injured in their business or property in that they never would have allowed their sensitive and personal data – property that they have now lost – to be provided to Defendant if they had been told or knew that Defendant failed to maintain sufficient security to keep such data from being hacked and taken by others.

192.    Plaintiff and the Class seek actual damages, compensatory damages, injunctive relief, and court costs and attorneys' fees as a result of Defendants' breach of implied contract.

### COUNT VIII
### <u>VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT</u>
#### *A.R.S. §44-1521, et seq.*
#### Against Defendant on Behalf of Plaintiff and the Arizona Subclass

193.    Plaintiff repeats the allegations in paragraphs 1-120 in this Complaint, as if fully alleged herein.

194.    §44-1522 provides, in relevant part:

The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

195.    Plaintiff and the members of the Arizona Subclass are "persons" as defined by A.R.S. §44-1521(6).

196.    Defendant provides "services" as that term is included in the definition of "merchandise" under A.R.S. §44-1521(5).

197.    Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of "merchandise"—as defined in the ACFA—in violation of the ACFA, including but not limited to the following:

a)  failing to maintain sufficient security to keep Plaintiff's and Arizona Subclass Members' confidential PII from being hacked and stolen;

b)  failing to disclose the data breach to Plaintiff and the Arizona Subclass in a timely and accurate manner, in violation of A.R.S. § 44-7501;

c)  misrepresenting material facts to Plaintiff and the Arizona Subclass, in connection with the "sale" of employee benefits administration services, by representing that Defendant did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Class Members' personal information; and

d)  failing to take proper action following the data breach to enact adequate privacy and security measures and protect Plaintiff's and Arizona Subclass Members' confidential PII from further unauthorized disclosure, release, data breaches, and theft.

198.    In addition, Defendant's failure to disclose that its computer systems were not well-protected and that Plaintiff's and Arizona Subclass Members' sensitive information was vulnerable and susceptible to intrusion and cyberattacks constitutes deceptive or unfair acts or practices because Defendant knew such facts would (a) be unknown to and not easily discoverable by Plaintiff and the Arizona Subclass; and (b) defeat Plaintiff's and Arizona Subclass Members'

ordinary, foreseeable and reasonable expectations concerning the security of Defendant's computer servers.

199.    Defendant intended that Plaintiff and the Arizona Subclass rely on its deceptive and unfair acts and practices, misrepresentations, and the concealment, suppression, and omission of material facts, in connection with Defendant's offering of employee benefits administration services and incorporating Plaintiff's and Arizona Subclass Members' PII on its computer servers, in violation of the AFCA.

200.    Defendant's wrongful acts occurred in the course of trade or commerce.

201.    Defendant's wrongful acts were and are injurious to the public interest because those practices were part of a generalized course of conduct on the part of Defendant that applied to all Arizona Subclass Members and were repeated continuously before and after Defendant obtained confidential financial, and personal data concerning Plaintiff and Arizona Subclass Members. All Arizona Subclass Members have been adversely affected by Defendant's conduct and the public was and is at risk as a result thereof.

202.    As a result of Defendant's wrongful conduct, Plaintiff and Arizona Subclass Members were injured in their business or property in that they never would have allowed their sensitive and personal data – property that they have now lost – to be provided to Defendant if they had been told or knew that Defendant failed to maintain sufficient security to keep such data from being hacked and taken by others.

203.    Defendant's unfair or deceptive conduct proximately caused Plaintiff's and Arizona Subclass Members' injuries because, had Defendant maintained the PII with adequate security, Plaintiff and Arizona Subclass Members would not have lost it.

204.    Plaintiff and the Arizona Subclass seek actual damages, compensatory, punitive damages, injunctive relief, and court costs and attorneys' fees as a result of Defendants' violations of the AFCA.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all Class members proposed in this Complaint, respectfully requests that the Court enter judgment in her favor and against Defendant as follows:

A.  For an Order certifying the Class and the Arizona Subclass, as defined herein, and appointing Plaintiff and Plaintiff's counsel to represent the Class and the Arizona Subclass;

B.  For injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the class members, including but not limited to an order:

(a)     Prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

(b)     Requiring Defendant to protect, including through adequate encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

(c)     Requiring Defendant to delete, destroy, and purge the PII of Plaintiff and the class members unless Defendant can provide the Court a reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and the class members;

(d)     Requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and class members' PII;

(e)     Requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

(f)     Requiring Defendant to audit, test, and train its personnel regarding any new or modified procedures;

(g)     Requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

(h)     Requiring Defendant to conduct regular database scanning and security checks;

(i)     Requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon employees' respective responsibilities with handling PII, as well as protecting the PII of Plaintiff and the class members;

(j)     Requiring Defendant to routinely and continually conduct internal training and education, at least annually, to inform security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

(k)     Requiring Defendant to implement, maintain, regularly review, and revise as necessary, a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

(l)     Requiring Defendant to meaningfully educate all class members about the threats they face as a result of the loss of their PII to third parties, as well as the steps affected individuals must take to protect themselves;

(m)     Requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from its servers, as well as programs sufficient to protect infiltration of its computer and data storage systems; and

(n)     Requiring Defendant to provide ten years of identity theft and fraud protection services to Plaintiff and the class members.

C.  For an award of compensatory, consequential, and general damages, including nominal damages or punitive damages, as allowed by law in an amount to be determined;

E.  For an award of restitution or disgorgement, in an amount to be determined;

F.  For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

G.  For prejudgment interest on all amounts awarded; and

H.  Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff, on behalf of herself and the Class of all others similarly situated, hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED: December 13, 2022

/s/ Alex D. Kruzyk
Alex D. Kruzyk (to seek admission *pro hac vice*)*
Bryan A. Giribaldo (to seek admission *pro hac vice*))*
**PARDELL, KRUZYK & GIRIBALDO, PLLC**
501 Congress Avenue, Suite 150
Austin, Texas 78701
Tele: (561) 726-8444
akruzyk@pkglegal.com
bgiribaldo@pkglegal.com